J. E. SNELL ET AL. v. PAUL CHATHAM.

(Filed 21 May, 1909.)

1. **Nuisance—Ponds—Public Health—Arbitration—Consent Order—Pleadings—Agreement—Scope of Action Enlarged.**

   In an action for injury from the maintenance of a pond, and to enjoin the rebuilding of a dam, the parties may, by a consent order of arbitration, voluntarily enlarge the scope of the controversy to include in the award a scheme of drainage proper to safeguard the public health; and when there is no evidence impeaching the award, a judgment rendered in accordance therewith is valid and binding.

2. **Nuisance—Ponds—Public Health—Arbitration—Consent Order—Agreement—Drainage—Scope of Action Enlarged—Consideration.**

   When, by consent of the parties to an action for damages and to enjoin the rebuilding of a dam alleged to be against the interest of the public health, an order of arbitration is made by the court, under which the complaining party agreed to execute such plan or scheme as the majority of the arbitrators should award as "proper to safeguard the public health in the premises," an exception to the power of the court to enforce an award requiring the drainage of an area of land which was in its natural condition cannot be sustained, the agreement of arbitration being a sufficient consideration.

ACTION for damages and injunction, heard by *Justice, J.,* at November Term, 1908, of MECKLENBURG.

This was an action brought upon the ground that the defendant, owner of a tract of land near Charlotte, had, in 1907,

erected a dam across a small branch on the said land and thereby created a pond or lake; that in August, 1908, by reason of heavy rainfall, the dam having been broken, the defendant was rebuilding the dam; that the effect of rebuilding the dam would be to create a pond of stagnant water, which would produce mosquitoes and communicate malaria to the plaintiffs and other residents of their neighborhood, thereby injuring the public health and creating a nuisance; and the plaintiffs prayed that the defendant be enjoined and restrained from the reconstruction of the dam.

A temporary restraining order was issued, and an order to show cause why the temporary restraining order should not be made permanent was served upon the defendant. A hearing was had before *Judge Justice* upon affidavits filed by the plaintiffs and the defendant. At the hearing it was agreed between the parties that the matter in controversy should be submitted to Doctors Gibbon, Montgomery and Misenheimer as arbitrators, the language of the agreement being as follows: "In the above-entitled action it is, by consent of parties, ordered and decreed that the temporary restraining order heretofore made in the cause be continued and in full force until the next civil term of this court. That the following experts, to wit: R. L. Gibbon, J. C. Montgomery and C. A. Misenheimer, be and they are hereby appointed as arbitrators and empowered to hear, at such times and places in this county as they may fix, the evidence that may be submitted to them by the parties; and they are hereby made arbitrators to settle and decide upon the matters in controversy in this action, and to submit to this court, at the next civil term thereof, their findings and awards, or that of any two of them, including such plan or scheme as they shall deem and find proper to safeguard the public health in the premises; and all parties to this action hereby agree to be bound by the findings and award of said arbitrators or of any two of them, their findings and award to be made the judgment of this court in this action." And this cause is retained for further direction.

The majority of the arbitrators filed their award as follows, at December Term, 1908, of Mecklenburg:

"The undersigned arbitrators, appointed by this honorable court, at October Term, 1908, to settle and decide upon the matters in controversy in this action, and to submit to this court their findings and awards, including such plan or scheme as they would deem and find proper to safeguard the public health in the premises, beg leave to report as follows: That, after due notice to the parties litigant, they met at the office of Dr. J. C. Montgomery, in the city of Charlotte, on 2 December, 1908, having first, by consent and at the instance of the parties, inspected and carefully examined the premises whereon was formerly maintained the dam and pond, all of which are more particularly described in the complaint and in the affidavits of the parties and their witnesses, which affidavits were, by consent, used as evidence before us at the hearing, the parties expressly waiving their rights to offer other evidence. From our inspection and examination of the said marshy tract upon the land of the defendant Chatham and from the evidence produced before us, we find as follows:

"First. That stagnant water, in the light of present-day medical opinion, is obnoxious to health in this country, chiefly as it serves for a breeding place for a certain species of malaria-carrying mosquito—the only means at present known by which that disease is disseminated. The life and habitat of the mosquito has received the most careful investigation at the hands of the United States health authorities, and, as bearing upon the question before us, we beg to briefly quote a description of the natural breeding places of these insects, which appears in Vol. XXIII, 17 July, 1908, of the Public Health Report of the United States Marine Hospital Service: 'The domestic species may be found breeding in any collection of water in or about the houses in which they lodge; they have been found in discarded tin, bottles, and broken crockery on the garbage heap; in buckets, tubs, barrels, cisterns and wells; in baptismal and other fonts; in flowerpots and sagging roof gutters; in street and roadside puddles, gutters and ditches, and in cesspools and sewers. The semidomestic (which is the malaria-carrying mosquito) species may occasionally be found breeding in tins, barrels, hoof prints, post holes and holes in trees or tree stumps, but they

usually prefer grass-bordered pools, slowly flowing ditches, the margins of lakes and streams, even such as are stocked with fish, provided the margins are shallow or are more or less choked with reeds and water plants so that the fish cannot reach them.' Accepting the above as authoritative, and applying the knowledge to the matter in hand, after a visit and examination of the locality in question, we reach the conclusion that the said marsh and bed of pond, now drained, furnishes an abundant breeding ground for the mosquito, but that it is not, in our opinion, worse in this respect than are numerous other low and badly-drained areas in and about the suburbs of the city of Charlotte, and some of them are contiguous to the neighborhood in which it is alleged that sickness has developed as a result of the pond formerly on the Chatham place. The sanitary method of handling the areas in dispute may be decided upon the general principles governing such matters, the dominant idea of which is the elimination of stagnant water. There can, of course, be no question that this can most thoroughly be done by simple drainage and filling in—the latter particularly is not always practical, the former, so far as our knowledge goes, is much more available. The drainage must, however, be thorough, and the ditches large enough and sufficiently well laid out to avoid the dangers of stagnation, as "slow-flowing" ditches, as previously shown, do not accomplish the object aimed at. In the specific case before us we would recommend thorough ditching, properly drained to suit existing conditions, as the ideal method of treating said area, and we find and award accordingly.

"Second. We further adjudge and award that the drainage, ditching and filling aforesaid shall be done by the defendant during the winter months and prior to spring, and so as to completely prevent the accumulation of stagnant water upon said premises.

"R. L. Gibbon,

"C. A. Misenheimer,

"3 December, 1908. *Arbitrators."*

The other arbitrator, Dr. J. C. Montgomery, filed a dissent, recommending instead of drainage a "free-flowing sanitary lake," *i. e.,* that the defendant be allowed to put back the dam.

There were no exceptions filed to the award by either party, and his Honor entered the following judgment:

"This cause came on to be heard before me at chambers, in the city of Charlotte, on the twentieth day of October, 1908, upon an order to show cause why the restraining order heretofore granted in this cause should not be continued to the hearing.

"At said hearing both plaintiffs and defendant were represented by counsel and argument was heard by me.

"During the argument a certain proposition was made by the defendant's counsel, and certain other propositions were made by the plaintiffs' counsel looking towards an amicable settlement of the matter in dispute. These propositions were rejected by the parties, and thereupon the court announced its conclusion that the restraining order should be continued till the hearing.

"Thereupon the defendant's counsel stated to the court that, rather than submit to such an order, the defendant would agree to accept one of the propositions made during the argument by the plaintiffs' counsel to the defendant's counsel in the presence of the court, and of the parties to the action.

"The plaintiffs' counsel thereupon signified their willingness, on the part of their clients, to still make with the defendant the agreement referred to.

"And thereupon the hearing was adjourned in order that the counsel of the respective parties might put in writing the agreement entered into orally by them in the presence of the court at the said hearing.

"Thereafter there was submitted to me, by the counsel of the respective parties, a consent order, which I signed, which order is on file in the papers in this action.

"The arbitrators appointed by that consent order having made their report, as will appear by reference thereto, now to carry out the agreement of the parties to this action as expressed in the aforesaid consent order, it is now ordered and adjudged as follows:

"It is ordered and adjudged that the said report of the said arbitrators be in all respects approved and confirmed, and the findings of said arbitrators and their award, as set out in their

said report, is made the judgment of this court in this action.

"It is therefore further considered and adjudged by the court that the restraining order heretofore granted in this cause be and the same is hereby made permanent, and the defendant is therefore perpetually restrained and enjoined from reconstructing and maintaining the pond or lake described in the complaint.

"And it is further considered and adjudged by the court that the defendant, within four months from this date, be required to drain the area of land heretofore covered by said dam or pond, as in the report of said arbitrators prescribed for the safeguarding of the public health in its vicinity.

"And the cause is held for further direction."

The defendant excepted and appealed.

*Burwell & Cansler* and *Clarkson & Duls* for plaintiffs.
*Tillett & Guthrie* for defendant.

CLARK, C. J., after stating the case: There was no exception to the award of the arbitrators. After his Honor had entered judgment in conformity therewith, the defendant excepted, assigning four grounds:

"1. That upon the award the court should not have signed judgment enjoining the erection of the dam.

"2. That the arbitrators went beyond the scope of their powers in recommending the drainage of the pond.

"3. That the plaintiffs have no right to any relief not set up in the complaint.

"4. That the court had no power to require the defendant to drain an area of land which was in its natural condition."

The first three exceptions are based upon the proposition that the complaint sets out a cause of action for injury from the maintenance of the pond and sought only to enjoin the rebuilding of the dam. But the parties, by their consent order, voluntarily enlarged the scope of the controversy and unequivocally submitted to the arbitrators, not only "to settle and decide upon the matters in controversy in this action" (which means the controversy upon the pleadings), but added *"including such plan or scheme as they shall deem and find proper to safeguard the public health in the premises;* and all parties to this action agree

to be bound by the findings and award of said arbitrators or any two of them, their findings or award to be made the judgment of the court in this action."

This was not an inadvertent or hasty agreement. His Honor sets out in his judgment the care and deliberation with which the consent order was made and the adjournment taken, that the parties might have a full understanding and that the able and experienced counsel might have the assent of their clients and put their agreement in writing, which was done. That the consent order embraced an agreement to settle, not merely the question of the re-erection of the dam, but was to include also *"such plan or scheme* as they shall deem and find proper to safeguard the public health in the premises" appears by the explicit language of the agreement. The arbitrators all three so understood and acted, for while two recommended drainage, the other recommended a "free-flowing lake or pond" as the better scheme or plan.

There is nothing to impeach the award, and by the previous consent of the parties it was properly entered as the judgment of the court.

Nor do we find any ground for the fourth exception, nor any difficulty in enforcing the order of the court as to drainage. If the defendant had made an agreement with the plaintiffs that, upon certain consideration paid or upon the ascertainment of certain facts he would drain his pond, this would be enforcible by a decree for specific performance. Here the defendant agreed to execute such plan or scheme as the majority of the arbitrators should award as "proper to safeguard the public health in the premises." One arbitrator thought a "free-flowing lake or pond" the plan. This would have suited the defendant, as this would have enabled him to put back and keep up his dam without fear of damages, and if the majority had so awarded, the plaintiffs must have acquiesced in the infliction of mosquitoes and malaria (if the lake did not remove them) and the loss of all claim for damages. The majority of the arbitrators, however, said "drainage" was the remedy, and the defendant should know how to be "a good loser," for, after all, the majority of an impartial board of arbitrators are more likely to be right than either party to the litigation.

It is an old saying that "fragments of all the sciences are taken up in ashes of the law." It is not long since that our progressive brethren of the medical profession have discovered that one kind of mosquito (anopheles) causes malaria; that another (stegomyia) carries yellow fever, and another still spreads the Asiatic cholera; that house flies spread typhoid fever, that fleas on rats communicate the dreaded Bubonic plague, and lesser germs, as *bacteria* and *bacilli,* are the agents of other diseases. For thus do "the weak things of the world confound the things which are mighty." 1 Cor., 27. Acting on these discoveries, under authority of law the stegomyia and yellow fever have been extirpated in Cuba and the Bubonic plague was stayed in San Francisco, because mosquitoes and rats were systematically destroyed by the officers of the law. There is no reason that the plaintiff's home shall not be freed of malaria by authority of a judgment based upon medical advice, especially as the parties agreed that such remedy (whatever the majority of the medical arbitrators should find it to be) should be entered as the judgment of the court.

Affirmed.